IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
ST. JOSEPH DIVISION

GWEN MUSCAVAGE,                )
                              )
            Plaintiff,        )
                              )
      v.                      )  Case No.
                              )  10-6033-CV-SJ-REL-SSA
MICHAEL J. ASTRUE, Commissioner )
of Social Security,           )
                              )
            Defendant.        )

## ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Gwen Muscavage seeks review of the final decision
of the Commissioner of Social Security denying plaintiff's
application for disability benefits under Titles II and XVI of
the Social Security Act ("the Act").  Plaintiff argues that the
ALJ erred in (1) failing to provide sufficient mental limitations
in the residual functional capacity, (2) failing to provide the
requisite narrative discussion describing how the medical
evidence supports the conclusion, (3) failing to specify the
frequency of the sit/stand option, (4) discounting the opinion of
treating physician Dr. Jaffri, and (5) improperly discounting
plaintiff's testimony.  I find that the substantial evidence in
the record as a whole supports the ALJ's finding that plaintiff
is not disabled.  Therefore, plaintiff's motion for summary
judgment will be denied and the decision of the Commissioner will
be affirmed.

## I.   BACKGROUND

On May 14, 2007, plaintiff applied for disability benefits
alleging that she had been disabled since May 3, 2007.
Plaintiff's disability stems from depression and anxiety, a back
injury, headaches, and tingling and numbness in her toes.
Plaintiff's application was denied.  On August 25, 2009, a
hearing was held before Administrative Law Judge Guy Taylor.  On
October 2, 2009, the ALJ found that plaintiff was not under a
"disability" as defined in the Act.  On March 8, 2010, the
Appeals Council denied plaintiff's request for review.
Therefore, the decision of the ALJ stands as the final decision
of the Commissioner.

## II.  STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for
judicial review of a "final decision" of the Commissioner.  The
standard for judicial review by the federal district court is
whether the decision of the Commissioner was supported by
substantial evidence.  42 U.S.C. § 405(g); Richardson v. Perales,
402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847,
850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th
Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir.
1996).  The determination of whether the Commissioner's decision
is supported by substantial evidence requires review of the

entire record, considering the evidence in support of and in opposition to the Commissioner's decision. Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989). "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing Steadman v. Securities & Exchange Commission, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991). However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts. "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

### III. BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of proving she is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of

not less than twelve months.  42 U.S.C. § 423(d)(1)(A).  If the plaintiff establishes that she is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform.  Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled.  These regulations are codified at 20 C.F.R. §§ 404.1501, et seq.  The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1.   Is the claimant performing substantial gainful activity?

> Yes = not disabled.
> No = go to next step.

2.   Does the claimant have a severe impairment or a combination of impairments which significantly limits her ability to do basic work activities?

> No = not disabled.
> Yes = go to next step.

3.   Does the impairment meet or equal a listed impairment in Appendix 1?

> Yes = disabled.
> No = go to next step.

4.    Does the impairment prevent the claimant from doing past relevant work?

>        No = not disabled.
>        Yes =  go to next step where burden shifts to Commissioner.

5.    Does the impairment prevent the claimant from doing any other work?

>        Yes = disabled.
>        No = not disabled.

## IV.  THE RECORD

The record consists of the testimony of plaintiff and vocational expert Lesa Keen, in addition to documentary evidence admitted at the hearing.

## A.    ADMINISTRATIVE REPORTS

The record contains the following administrative reports:

## Earnings Record

The record establishes that plaintiff earned the following income from 1980 through 2009:

| Year | Income | Year | Income |
|------|--------|------|--------|
| 1980 | $      0.00 | 1995 | $ 1,190.36 |
| 1981 | 0.00 | 1996 | 0.00 |
| 1982 | 149.46 | 1997 | 0.00 |
| 1983 | 43.68 | 1998 | 3,154.37 |
| 1984 | 0.00 | 1999 | 1,422.15 |
| 1985 | 0.00 | 2000 | 6,882.18 |
| 1986 | 0.00 | 2001 | 7,308.45 |
| 1987 | 0.00 | 2002 | 3,916.71 |

| 1988 | 3,955.04 | 2003 | 7,652.33 |
|------|----------|------|----------|
| 1989 | 6,853.44 | 2004 | 14,154.38 |
| 1990 | 8,610.66 | 2005 | 7,687.31 |
| 1991 | 5,246.25 | 2006 | 12,237.98 |
| 1992 | 0.00 | 2007 | 4,308.09 |
| 1993 | 0.00 | 2008 | 6,760.68 |
| 1994 | 3,228.96 | 2009 | 0.00 |

(Tr. at 99-106).

**Disability Report - Field Office**

On May 23, 2007, J. Meginness, an interviewer, met face to face with plaintiff (Tr. at 173-176).  The interviewer observed no limitations in hearing, reading, breathing, understanding, coherency, concentrating, talking, answering, sitting, standing, walking, seeing, using her hands, or writing (Tr. at 175). "Interview took over 1 1/2 hr. but she did not show any signs of pain." (Tr. at 175).

**Function Report**

In a Function Report dated June 10, 2007, plaintiff listed the following daily activities:

> From the time I actually wake up and get out of bed, I usually will brush my teeth, wash up some, get dressed, put dishes away if there is any, laundry (have to do by hand!) this usually takes a couple of hours.  Dust some and try to vaccum *[sic]* what I can. Fix a little lunch, lie down for a nap.  On school days I get my daughter up and off to school. Then in the afternoon I fixed some supper and finish up on laundry and dishes, sometimes the trash.  After supper I sit outside if it is nice or watch T.V. before going to bed.

(Tr. at 178).  Plaintiff reported that she helps her daughter and ex-husband with their activities of daily living (Tr. at 179).

Plaintiff was asked what she was able to do before her illness, injury or condition that she cannot do now (Tr. at 179). She wrote, "go up and down stairs easily, long walks, doing outdoor activities.  Socialize more with people." (Tr. at 179).

Plaintiff is able to prepare a full meal but needs help with instructions (Tr. at 180).  She wrote that she is able to do laundry, dishes, some dusting (that does not require a lot of reaching), a little vacuuming (Tr. at 180).  Plaintiff's hobbies include reading, walking, camping, fishing, and computer board games (Tr. at 182).  She tries to attend church services every Sunday (Tr. at 182).

Plaintiff was asked to circle all of the items her condition affects (Tr. at 183).  She circled lifting, squatting, bending, reaching, walking, sitting, kneeling, stair climbing, memory, completing tasks, concentration, understanding, following instructions, and getting along with others.  She did not circle standing or using her hands.  Plaintiff reported that she could walk a block and a half and then would have to rest for 15 or 20 minutes (Tr. at 183).

**Disability Report**

In an undated Disability Report, plaintiff reported that she can sit for a half hour and stand for a half hour (Tr. at 200).

**Function Report**

In a Function Report dated December 19, 2008, plaintiff reported that she sleeps a lot during the day, that when she is up she usually tries to do housework and walks when she can get out (Tr. at 216). "I live on the second floor of an apartment complex and it is exercize [sic] for me just to go up and down the stairs without stopping to catch my breath or breathing heavly [sic] when I do finish comming [sic] up them. Then I have to sit down." (Tr. at 216).

Plaintiff reported that she takes care of her daughter and granddaughter; she fixes meals, does laundry and does other household chores (Tr. at 217). She feeds and grooms her animals (Tr. at 217). Plaintiff spends most of the day doing dishes, laundry, cleaning, mopping when she can, and sweeping when she can (Tr. at 218). Plaintiff can shop for food, clothing, personal items, furniture, etc., and when she shops it takes "usually all day when I do go." (Tr. at 219). Plaintiff listed her hobbies as reading, walking, playing on the computer, board games, gardening, and crocheting (Tr. at 220). She does these things "not too often" because she does not "have the desire to

do them anymore. Lost *[sic]* of interest." (Tr. at 220).

Plaintiff was asked to check all of the items her illness, injury, or condition affects (Tr. at 221). She checked lifting, squatting, bending, standing, kneeling, stair-climbing, memory, completing tasks, understanding and following instructions (Tr. at 221). She did not check reaching, walking, sitting, concentration, using her hands, or getting along with others (Tr. at 221). She can lift no more than 50 pounds (Tr. at 221).

In the "remarks" section of this form, plaintiff wrote, "I am also manic depressive bipolar, so it is hard for me to do any and most activities of daily living. . . . I cannot concentrate or focus on any one thing for long periods of time. . . . I'm limited to not sitting or standing for long periods of time due to my pain which is the reason that I'm not able to do any of these things without complcations *[sic]*." (Tr. at 223).

**Pain Questionnaire**

In a Pain Questionnaire dated December 19, 2008, plaintiff indicated that she was taking Flexeril (muscle relaxer), Trazodone (used to treat insomnia), Tramadol (treats moderate to severe pain), Loratadine (antihistamine), and Naproxen (non-steroidal anti-inflammatory) (Tr. at 224). She had been taking this medicine for two years; it helped relieve her pain but sometimes took a couple hours to work. Her medication was taken

twice a day.

Plaintiff indicated that she was able to walk a couple of blocks, she could stand for 20 to 25 minutes at a time, and she could sit for 15 to 20 minutes at a time (Tr. at 226). She was able to do light housekeeping chores without assistance (Tr. at 226).

**B.** ***SUMMARY OF MEDICAL RECORDS***

May 3, 2007, is plaintiff's alleged onset date.

On May 30, 2007, plaintiff underwent a psychological evaluation by Glenn Schowengerdt, M.S., L.C.S.W. (Tr. at 264-266, 271-273).

Observations:
Ms. Gwendolyn Marie Muscavage is a 43-year-old Caucasian female of approximately 5' 6" height and 200 lbs. weight. She arrived for her appointment a few minutes early wearing a blue jean shirt with a white knit flowered shirt underneath, blue jeans, and tennis shoes. Her hygiene appeared adequate and her posture was good. Her gait indicated no evidence of gross maladies. Eye contact was good. Motor behavior exhibited no evidence of gross maladies. Rate and tempo of her speech were within normal limits. Comprehension appeared to be within the average range. There was no evidence of long or short term memory loss although Ms. Muscavage stated that she had difficulty remembering things. Her attention span appeared to be within the average range. Her intelligence was estimated to be within the low average range. She exhibited no gross fluctuations in mood and was able to express a full range of affect. She exhibited no evidence of delusional thinking and her predominant mood throughout the interview was pleasant.

Interview:
Ms. Muscavage understood the reason for her evaluation today and stated her problems are that she had a back injury in

2004 or 2005 and is now experiencing a lot of stress.  She stated she had worked as a CNA for 10 years and around 2004 her daughter began to give her difficulties.  She began running away and getting into other trouble.  Ms. Muscavage stated she began to experience disturbances in her sleeping pattern where she would sleep a lot or not at all.  She was experiencing tightness in her chest, difficulty breathing, difficulty concentrating, and found herself making things worse than they really were the more she thought about them.

. . .  [In describing her childhood) Ms. Muscavage stated she never has liked crowds.

. . .  She was divorced in 2004 shortly after moving to St. Joseph, Missouri.  Ms. Muscavage stated she and her husband still date now and are good friends now but they are not married and not living with each other.

It was during 2004 that Ms. Muscavage had her back injury.  It occurred on the job while she was working as a CNA.  She stated she was off of work for 6 months and by the time she returned to work her daughter had begun hanging out with the wrong crowd.  She was hanging out with friends who were stealing and running away so her daughter began doing the same.  Ms. Muscavage stated all of her stress went into high gear at this time.

In exploring other psychiatric symptoms, Ms. Muscavage believes she [has] experienced depression before which she described as irregular sleeping patterns, crying for no reason, and major changes in eating habits.  Ms. Muscavage reports that she has dropped 60 pounds in the last 3 to 4 months.  Health concerns consist of her back injury and she also stated she has bad feet.  Currently Ms. Muscavage is taking no regular medications. . . .  She believes her relationship with her daughter is good. . . .

Summary:
. . .  Throughout the interview it became clear that Ms. Muscavage is suffering from symptoms of anxiety which moderately interfere with her daily life.

Diagnosis:
Axis I:   Generalized Anxiety Disorder
                    * * * * *

Axis V:    GAF 57[1]

(Tr. at 264-266).

On June 7, 2007, plaintiff was examined by Brett Miller, M.D., in connection with her application for Medicaid (Tr. at 269-270).

> HISTORY OF PRESENT ILLNESS: . . . Her back pain began in December, 2005 when she slipped and fell at work.  She states that her back has really not been better since.  She has had physical therapy without much relief.  She describes her back pain as being around her low belt-line.  It is sharp, stabbing, constant, and worse with activity.  It does feel like it is getting worse.  She denies any lower extremity weakness or numbness.  She does say she occasionally has tingling in her left foot and left hand. . . .  No radiation of pain into her lower extremities. Overall she has trouble finding comfortable positions.

> PHYSICAL EXAMINATION:  . . .  In general, mood and affect are normal.  Patient is awake, alert, cooperative, and in no acute distress.  The patient is slightly overweight.  She walks with a normal gait and station today. . . .  Palpation elicits mild tenderness in the surrounding musculature of her lumbar spine.  Range of motion allows her to flex at the hips to place her hands at the level of her ankles.  She returns to an upright position without list or dysrhythmia. She walks on her heels and tiptoes without difficulty today. . . .  Strength testing is 5/5 and symmetrical at all bilateral lower extremity muscle groups. . . .

> RADIOGRAPHIC EVALUATION:  4 views of the lumbar spine demonstrate mild disc space loss at the L4/5 level with associated osteophytic spurring throughout.  Overall

---

[1]A global assessment of functioning of 51 to 60 means moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).

vertebral height is well maintained.  No spondylolisthesis[2] or spondylolysis.[3]

MRI report from April, 2005 was reviewed and demonstrates disc desiccation[4] at the L5/S1 level.  Overall, there was no evidence of any intervertebral disc herniation or bulge.

IMPRESSION:
1.   Degenerative disc disease of the lumbar spine.
2.   Low back pain.

RECOMMENDATIONS:  The patient's MRI is negative for any disc herniation or disc bulge.  Overall, I do not think this should affect her in regards to her employment.  She should consider an exercise program, weight loss, and smoking cessation.

(Tr. at 269-270).

On June 27, 2007, plaintiff was examined by David Cathcart, D.O., at the request of Disability Determinations (Tr. at 275-277).

CHIEF COMPLAINT:  Back and leg pain; anxiety/depression.

_____

[2]Spondylolisthesis is a condition in which a bone (vertebra) in the lower part of the spine slips out of the proper position onto the bone below it.

[3]Spondylolysis is a specific defect in the connection between vertebrae, the bones that make up the spinal column. This defect can lead to small stress fractures (breaks) in the vertebrae that can weaken the bones so much that one slips out of place, a condition called spondylolisthesis.

[4]Vertebrae are bones that form an opening in which the spinal cord passes.  These bones are stacked one on top of another. In between the vertebrae are flat, cushiony discs (known as intervertebral discs) that act as shock absorbers.  The discs normally contain a certain amount of fluid.  Disc desiccation is abnormal dryness of the discs.  As a result of this dryness and loss of fluid, the disc(s) degenerate (wear away) to a degree.

HISTORY OF PRESENT ILLNESS:  The patient . . . last worked in May 2007 as a certified nursing assistant. . . .  She quit working primarily because of problems associated with anxiety and stress.  This has been a chronic problem for her and while it has situational components it is mostly a long-term state of being.  She does not feel suicidal or homicidal.  She has never been hospitalized for this.  She has seen a counselor on occasion but not regularly.  She is not on any medications for it.  It does cause her trouble sleeping and troubles with concentrating and focusing on her work.  In addition, she had a slip and fall injury in 2005 causing some low back pain.  She has seen a doctor for it periodically and apparently an MRI was done of her back which showed some degenerative disk disease.  No surgery was recommended.  In addition to the low back pain, she has pain radiating down her leg periodically with tingling in all of the toes of her left foot.  She has troubles with prolonged sitting or standing, or lifting. . . .

CURRENT MEDICATIONS:  None. . . .

SOCIAL HISTORY:  The patient smokes one pack of cigarettes daily. . . .

REVIEW OF SYSTEMS:  Positive for chest pain on exertion that may be anginal in nature.  Also, some dyspnea on exertion. . . .

PHYSICAL EXAMINATION:  Height 66 inches, weight 239. . . . Pain level 6 of 10.  In general, this is a pleasant, well-developed, well-nourished, 43-year-old white female who is in no acute distress.  She is alert, oriented and cooperative.  Her hygiene is good.  I would estimate her level of intelligence to be average.  She uses no assistive devices for ambulation and none are medically indicated. Her affect is flattened. . . .

Musculoskeletal exam reveals the gait to be a normal fluid gait.  Tandem walking was intact.  The patient was able to walk on toes and heels without difficulty.  Squatting is 90 degrees which is limited by back pain but she can arise from that position on her own power.  The patient was able to squat fully and arise from a squat.  There was no difficulty getting on or off the exam table.  Range of motion of the cervical and dorsolumbar spine reveal range of motion to be full and unguarded.  There is no evidence of paraspinal

muscle spasm. Straight leg raising was negative in the
seated and lying position. There was a negative Patrick
test. Range of motion of the shoulders, elbows, wrists,
hips, knees and ankles are full and bilaterally symmetrical
and unguarded. There is no evidence of synovial swelling or
overtying joint erythema. Range of motion of all joints of
the hands and fingers are normal. There are no significant
degenerative findings evident. . . . The patient is able to
make a fist with both hands. Manual dexterity is normal. .
. .

IMPRESSIONS
1.   Anxiety/depression.
2.   Degenerative disk disease.
3.   Chronic obstructive pulmonary disease.
4.   Possible coronary artery disease.

EXPLANATION: This examinee's barrier to return to the
competitive labor market, by her own admission, is the
anxiety and depression which she says makes it hard for her
to function at work. It is complicated by some degree of
degenerative disk disease. However, I believe that all of
these conditions could be accommodated in the competitive
labor market.

(Tr. at 275-277).

On August 6, 2007, James Spence, Ph.D., completed a

Psychiatric Review Technique (Tr. at 278-289). Dr. Spence found

that plaintiff's mental impairment is not severe. He found that

plaintiff has mild restriction of activities of daily living;

mild difficulties in maintaining social functioning; no

difficulties in maintaining concentration, persistence, or pace;

and no episodes of decompensation (Tr. at 286). In support of

his findings, Dr. Spence wrote the following:

This 43-year-old claimant alleges disability due to stress
and anxiety. MER [medical records] notes no counseling, but
claimant was sent for DFS exam. She was noted as taking no

15

medications. She exhibited no gross fluctuations in mood and was able to express a full range of affect. Her predominant mood throughout the interview was pleasant. Eye contact was good and rate and tempo of speech was wnl [within normal limits]. Her comprehension and attention span appeared to be within average range. No evidence of long or short term memory loss although claimant stated she had difficulty remembering things. Though claimant reports she has panic attacks, there is no evidence to support this.

Claimant reports that she regularly goes to church, library and grocery store. As she has no license, she walks or uses public transportation. She stated her memory was shot but as noted by examiner, she experienced no difficulty remembering things. Claimant performs all HH [household] tasks and, based on her report, willingly goes into settings where there will be people though she reports she doesn't like to be around people. Claimant's condition is assessed as nonsevere and her allegations as less than fully credible.

DDS CE [consultative exam] source noted no issues that would limit her ability to work. DFS examiner indicated she is suffering from symptoms of anxiety which moderately interfere with her daily life. The report in file and claimant's report of activities on ADL [activities of daily living] form do not indicate that she has significant limits. Therefore, minimal weight is given this statement.

(Tr. at 288).

On September 10, 2007, plaintiff was seen at the Buchanan County Health Department as a new patient (Tr. at 350). She described lower back pain from an injury two years earlier and said it occasionally radiates down her left leg. "No meds for a long time". She complained of mood swings and sleeping "all the time." Plaintiff said she wanted to see a counselor. Plaintiff said her ex-husband and daughter were both bi-polar. On exam, plaintiff was observed to be pleasant. She had lumbar spine

tenderness; everything else was normal. Plaintiff's self-reported[5] anxiety and depression indicated moderate anxiety, severe depression. Plaintiff was assessed with bipolar disorder and chronic lower back pain. She was prescribed Seroquel (anti-psychotic), Flexeril (muscle relaxer), and Naproxen (non-steroidal anti-inflammatory).

On September 13, 2007, the Buchanan County Health Department talked to plaintiff about her lab work (Tr. at 350). She had low HDL. She indicated that she "walks all the time", 30 minutes per day. She was still smoking one pack of cigarettes per day.

On October 30, 2007, plaintiff called the Buchanan County Health Department and indicated she had been out of Seroquel for a few days and was unable to sleep or function.

On November 12, 2007, plaintiff saw Dr. Jaffri for an evaluation (Tr. at 307). She was a 44-year-old divorced mother of a 16-year-old daughter and had been unemployed since May 2007. Her chief complaint was "I have days when I want to sleep." Plaintiff also complained of days when she feels tired, does not

_____

[5]The Zung Self-Rating Anxiety Scale ("SAS") was designed to quantify a patient's level of anxiety. SAS is a 20-item self-report assessment device which include measures of state and trait anxiety. Each question is scored on a scale of 1-4 ((based on these replies: "a little of the time," "some of the time," "good part of the time," "most of the time"). The scores range from 20-80 with 20-44 being normal, 45-59 being mild to moderate, 60-74 being market to severe, and 75-80 being extreme. There are also Zung scales for depression.

want to get out of bed, has no energy, and sleeps poorly. She
reported recurrent episodes of depression "which were not
strong." Plaintiff's daughter had run away in May 2007 which was
when plaintiff noticed the depression, she was very emotional and
was crying. Plaintiff was unemployed; her daughter was getting
SSI. Plaintiff reported smoking 1/2 pack of cigarettes per day.
She was described as unkempt, dressed in street clothes, her
affect was restricted, insight and judgment were fair, her memory
and concentration were fair. She was assessed with major
depressive disorder, recurrent, moderate, with a GAF of 65.[6] Dr.
Jaffri discontinued plaintiff's Seroquel and started her on
Celexa and Trazodone.

On December 3, 2007, plaintiff saw Dr. Jaffri and reported
no side effects from Celexa but some diarrhea from the Trazodone
(Tr. at 306). She reported no worsening of depression and only a
few episodes of crying. She was more motivated and less tired.
She was neatly dressed, her mood was fair, affect and mood
congruent, no suicidal or homicidal ideation, insight and
judgment were fair, her memory and concentration were fair. Dr.
Jaffri increased plaintiff's Celexa to 40 mg and he encouraged

---

[6]A global assessment of functioning of 61 to 70 means some
mild symptoms (e.g., depressed mood and mild insomnia) or some
difficulty in social, occupational, or school functioning (e.g.,
occasional truancy, or theft within the household), but generally
functioning pretty well, has some meaningful interpersonal
relationships.

her to start counseling which he noted she had not done.  He told her to continue taking the Trazodone.

On January 3, 2008, plaintiff saw Dr. Jaffri (Tr. at 305). "She denies any new problems and says the increase in Celexa is working well for her."  Her crying had decreased, her anxiety had decreased, she was more motivated and had few periods of irritability.  Plaintiff was neatly dressed, pleasant and cooperative, her mood was fair, her affect and mood were congruent, she had no suicidal or homicidal ideation, her memory and concentration were fair, everything else was normal.  Dr. Jaffri assessed major depressive disorder, recurrent, and told her to continue with her current medications.

February 6, 2008, records with the Buchanan County Health Department indicate that plaintiff was "walking everywhere" but not doing structured exercise, and she was still smoking about a pack of cigarettes per day (Tr. at 349).  "Cessation discussed."

On February 15, 2008, plaintiff underwent a psychological evaluation by Glenn Schowengerdt, M.S. (Tr. at 386-390).

> Observations:
> . . .  Her hygiene was adequate, and her posture was good. Her gait offered no evidence of gross maladies.  Eye contact was good.  Motor behavior exhibited no evidence of gross maladies.  Rate and tempo of her speech were within normal limits.  Comprehension was within the average range. There was no evidence of long or short term memory loss. Her attention span was within average limits. Her intelligence was estimated to be within the low average range.

<u>Interview</u>:
. . .  Ms. Muscavage stated she has been depressed since
April or May of 2007.  She stated she was having a lot of
problems with her teenage daughter.  She stated her daughter
had run away for three weeks, and Ms. Muscavage could not
find her.  She stated she quit her job to deal with her
daughter.  Ms. Muscavage stated that it is currently an
effort for her to get out of bed every morning.  She stated
she does not want to do anything anymore.  She stated she
has days where she cries all the time.  I asked how
frequently this is occurring.  Ms. Muscavage stated that her
crying spells are occurring nearly daily. She stated she is
extremely sensitive and also has difficulty expressing
herself to others.  She stated she frequently feels
worthless, and hopeless, she stated she has had thoughts
about what it would be like if she were dead and gone.  She
stated she has never actively planned suicide though.  She
added that she has wished that others in her life would die.
Ms. Muscavage stated she is frequently nervous, and anxious,
about everything. She stated her hands will shake, and she
will feel overwhelmed. . . .  She stated the symptoms occur
whether she is alone or in a crowd. She stated the
medications she is taking seem to help with this.

* * * * *

Ms. Muscavage and her husband divorced during 2003. During
2004 he came back.  It was around this time that Ms.
Muscavage's daughter began to exhibit behavioral
difficulties.  She stated they and just moved to St. Joseph,
and were living in a bad section of town.  Her daughter
began to run with all the neighborhood kids, at all hours of
the night.  She stated her daughter has been in trouble ever
since she was 14. She stated her daughter is doing better
right now, and is nearly ready to get off of probation.

* * * * *

<u>Summary</u>:
. . .  Throughout the interview it became clear that Ms.
Muscavage has been experiencing many symptoms of depression.
She also described many symptoms of panic attacks.

<u>Diagnosis</u>:
Axis I:   Dysthymic Disorder, with panic attacks
          Mathematics *[sic]* Disorder

* * * * *

Axis IV:  difficulty accessing healthcare, financial
          difficulties employment difficulties, marital
          dysfunction and divorce, family problems, parent-
          child problems, difficulties with interpersonal
          relations, difficulties with primary support group

Axis V:  54[7]

On February 25, 2008, plaintiff saw Dr. Jaffri for a follow
up (Tr. at 304). "She is doing fairly well - Her daughter got
off probation. . . . No worsening of depression or crying -
sleep & apetite [sic] O.K. No suicidal ideation but has
pessimistic thoughts." Dr. Jaffri performed a mental status
exam. He noted that she was cooperative, her mood was fair, her
memory and concentration were fair, her affect was restricted,
her mood was congruent, she had no suicidal or homicidal
ideation, everything else was normal. He told her to continue on
her same medications.

On April 9, 2008, plaintiff saw Dr. Jaffri and reported no
worsening of depression overall and no crying (Tr. at 303). Dr.
Jaffri performed a mental status exam and noted that plaintiff
was pleasant and cooperative, her mood was fair, her mood and
affect were congruent, her memory and concentration were fair,

---

[7]A Global Assessment of Functioning of 51 to 60 means
moderate symptoms (e.g., flat affect and circumstantial speech,
occasional panic attacks) or moderate difficulty in social,
occupational, or school functioning (e.g., few friends, conflicts
with peers or co-workers).

she had no suicidal or homicidal ideation, everything else was normal. She was told to continue her same medications.

On May 20, 2008, plaintiff saw Dr. Jaffri and reported that she was planning to move to a different place; she felt stressed out because of her daughter and her boy friend's illness (Tr. at 302). "No crying or worsening of depression." Dr. Jaffri described plaintiff as cooperative, her mood was fair, her mood and affect were congruent, her memory and concentration were fair, she had no suicidal or homicidal ideation, the rest of the mental status exam was normal. He assessed major depressive disorder and told plaintiff to continue on her same medications.

On June 4, 2008, plaintiff was seen by Peggi Riche, a nurse practitioner (Tr. at 315-318). Plaintiff weighed 260 pounds. She reported smoking 1 1/2 packs of cigarettes per day. Plaintiff was assessed with a sinus infection and esophageal reflux. She was given prescriptions for Claritin and Zantac.

On July 1, 2008, plaintiff saw Dr. Jaffri for a follow up (Tr. at 301). Plaintiff was worried because her landlord sold the place where she was living, her daughter was pregnant, and her boy friend moved out. She had no worsening of depression or crying. In a mental status exam, Dr. Jaffri concluded that plaintiff was adequately groomed, she had no suicidal or homicidal ideation, her speech was normal, her memory and

concentration were fair, and the rest of the exam was normal.  He assessed major depressive disorder and continued her on her same medications.  He encouraged her to call Social Services about housing and to return in six weeks.

On July 27, 2008, plaintiff was seen at Heartland Regional Medical Center for back pain after having fallen down several steps four days earlier (Tr. at 375-377).  She reported increased pain with sitting or turning in bed.  Tylenol improved her pain. She had no increased pain with ambulation.  Plaintiff denied paresthesias.[8]  "Denies tobacco use."  On exam plaintiff had normal range of motion, no tenderness, normal motor strength, normal gait, and her psychiatric exam was "appropriate".  She was assessed with a contusion of her sacrum and coccyx.  She was given Relafen (non-steroidal anti-inflammatory) with no refills and Tramadol (pain reliever) with no refills.  "Sit on pillow while at work.  Lay *[sic]* on sides during sleeping hours."

Plaintiff failed to show for an appointment with Dr. Jaffri on August 12, 2008 (Tr. at 302).

Plaintiff failed to show for an appointment with Dr. Jaffri on August 21, 2008 (Tr. at 302).

On September 23, 2008, plaintiff returned to see Dr. Jaffri after four months and two missed appointments but reported being

---

[8]A skin sensation, such as burning, prickling, itching, or tingling, with no apparent physical cause.

compliant with her medications (Tr. at 300).  She reported
working as a CNA.  She continued to have periods of low moods but
said she was able to cope with them.  Plaintiff's daughter and
her boy friend were living with plaintiff. Plaintiff reported no
crying spells.  Dr. Jaffri described plaintiff as unkempt but
pleasant and cooperative.  Her insight and judgment were fair,
her memory and concentration were fair.  He continued her on the
same medications, encouraged supportive therapy, and encouraged
compliance with follow ups and medication.

On December 30, 2008, plaintiff saw Dr. Jaffri in a follow-
up appointment after not having been in for the past three months
(Tr. at 299).  She reported being worried because her grandchild
was in the hospital, her daughter was having conflicts with her
boy friend, plaintiff was working as a CNA which she found
stressful.  She reported feeling sleepy and experiencing
anhedonia.  Her memory and concentration were fair.  She was
instructed to continue with her Celexa and to hold the Trazodone
for a while since she was sleeping well (Tr. at 299).

On January 8, 2009, plaintiff was seen by Peggi Riche, a
nurse practitioner (Tr. at 314-315).  She complained of coughing
for the past three to four days.  Plaintiff's diagnosis history
included alcohol dependence without dementia, depression, and
bipolar disorder NOS (not otherwise specified).  She was

consuming three to four 20-ounce bottles of caffeinated beverages and smoking 1 1/2 packs of cigarettes per day but was drinking no alcohol. On exam she had no shortness of breath and normal heart sounds. She weighed 250 pounds. Plaintiff was assessed with upper respiratory infection and was given an antibiotic and a decongestant.

On January 28, 2009, Dr. Jaffri completed a Mental Disorder Questionnaire form (Tr. at 294-298). He described plaintiff as neatly dressed, articulate, and not needing assistance to keep her appointments. Plaintiff had complained of depression, being overwhelmed, anhedonia [loss of the capacity to experience pleasure], and dysphoria [unpleasant or sad mood]. The form asks for a history of hospitalization and treatment; however, Dr. Jaffri repeated plaintiff's alleged symptoms: poor sleep, irritability, dysphoria, crying, emotional lability [a state in which ones emotions are easily aroused]. Dr. Jaffri described plaintiff as pleasant with restricted affect[9] and no suicidal or homicidal ideation. When asked to describe plaintiff's orientation, memory, concentration, etc., Dr. Jaffri wrote, "alert and oriented." The form asked for evidence of anxiety, depression, and other things, and said, "Please describe objective signs of any diagnosed affective disorder." Dr. Jaffri

---

[9]Reduction in the intensity of affect, to a somewhat lesser degree than is characteristic of blunted affect.

wrote what appears to be "low mood" and "anxious". He did not include any objective signs. He indicated that her reality is intact. He was asked to indicate to what extent plaintiff's mental condition interfered with her present daily activities, and he wrote, "Anhedonic" meaning she does not experience pleasure. He was asked to describe plaintiff's ability to sustain focused attention, complete everyday household routines, follow and understand instructions, etc. He wrote, "poor concentration." He was asked to describe plaintiff's ability to adapt to stresses common to the work environment including decision making, attendance, schedules, and interaction with supervisors, and he wrote, "stressed out." Finally, he indicated that her prognosis was "guarded."

On January 30, 2009, plaintiff was seen at Heartland Regional Medical Center complaining of a severe cough for the past month (Tr. at 371-372). She had "no other significant complaints". Plaintiff said she was working at a nursing home and smoked 1/2 to one pack of cigarettes per day. She was taking Celexa and Trazodone. X-rays showed early pneumonia and some bronchitis. Her physical exam was normal with the exception of her lungs. She was told to rest, drink fluids, "no smoking," and she was given an inhaler, a cough medicine, and a "note for off work until Monday."

On February 2, 2009, plaintiff was seen by Peggi Riche, a nurse practitioner, for a follow up of an emergency room visit (Tr. at 312-314). She had been wheezing and coughing and she said she was assessed with pneumonia. Plaintiff reported no cardiac history, no congestive heart failure, no migraine headaches. She reported alcohol dependence without dementia, depression, and bipolar disorder NOS (not otherwise specified). She weighed 250 pounds. She reported consuming three or four 20-ounce bottles of caffeinated beverages and smoking 1 1/2 packs of cigarettes per day but she was using no alcohol. She was assessed with acute bronchitis and was given a prescription for Prednisone, a steroid. "The patient's goal is to maintain regular exercise."

Plaintiff saw Dr. Jaffri on February 16, 2009, for a follow up on her major depressive disorder (Tr. at 345). She reported having had an altercation with her daughter's boy friend. She said she occasionally felt overwhelmed by the stressors in her home. Plaintiff was observed to be casually dressed, pleasant and euthymic.[10] She continued to work as a certified nurse assistant (Tr. at 345). She reported no problems with the increased Celexa, and Dr. Jaffri decided to discontinue the Trazodone, although he put a question mark after this plan (Tr. at 345).

---

[10]Normal mood in which the range of emotions is neither depressed nor highly elevated.

On February 23, 2009, Sandip Sen, M.D., completed a Psychiatric Review Technique (Tr. at 320-332). Dr. Sen found that plaintiff suffers from major depressive disorder, single episode, moderate, and generalized anxiety disorder which resulted in mild restriction of activities of daily living; mild difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence or pace; and no episodes of decompensation. In support of these findings, Dr. Sen wrote:

> 45 year old claimant alleging back injury, anxiety, headache tingling and numbness, onset 5/3/07. MER [medical records]: 5/30/07: Psych CE [consultative evaluator] evaluation revealed tiredness, weight loss, sad mood, moderate degree of anxiety, no fluctuation of mood, adequate hygiene, average comprehension, no memory problems, full affect range worked as a CNA for several years until started having problems with daughter running away, on no medications with moderate limitations, adequate cognitive skills, diagnosed as Generalized Anxiety Disorder GAF 57.

> Dr A Jaffri MD: 11/12/07 recurrent depression "which were not strong" after daughter ran away in 5/07, placed on Seroquel which made her very tired, no hx [history] of past antidepressants. Mood depressed, affect congruent, logical thoughts, fair concentration insight and judgement, no SI/HI [suicidal ideation/homicidal ideation], Diag[nosis]: MDD [major depressive disorder] GAF 65. Plan, start Celexa 20 mg.

> 12/3/07 some episodes of crying, motivated but tired, on Celexa 30 mg., plan to increase to 40 mg.

> 1/3/08 doing well and symptoms improved after increase in dose of Celexa to 40 mg., no SI/HI [suicidal ideation/ homicidal ideation], few periods of irritability, neatly dressed, logical thoughts, fair concentration.

2/25/08: doing fairly well, has some pessimistic thoughts otherwise coping well, no acute psychiatric symptoms, concentration and mood fair, plan continue meds Celexa 40 mg.

4/9/08: patient at baseline, no worsening of symptoms, unremarkable mental status, no active psych symptoms, meds Celexa 40 mg.

5/20/08: patient at baseline, no crying or worsening of mood symptoms, alert oriented, cooperative, mood fair, no SI/HI [suicidal ideation/homicidal ideation], on Celexa 40 mg., plan continue current tx [treatment] plan and meds.

7/1/08: no worsening of depression or psych symp[toms], stressors are BF [boy friend] moved out, daughter pregnant, mood concentration memory fair, no active psych symptoms, no SI/HI [suicidal ideation/homicidal ideation], plan continue current meds, Celexa 40 mg.

9/23/08: seen after 4 months, 2 missed appointments, working as a CNA, periods of low mood, able to cope, no crying, alert and oriented, pleasant, no psych symptoms noted meds Celexa 40 mg. daily, plan to continue current meds and therapy, return in 2 months or as needed.

12/30/08 seen for F/U [follow up] after 3 months, conflicts with BF [boy friend], working as a CNA, alert and oriented, pleasant, mood low, no SI/HI [suicidal ideation/homicidal ideation], memory and concentration is fair, meds Celexa 40 mg., Trazodone 25-50 mg., Plan to increase Celexa to 50 mg. d/c [discontinue] trazodone as sedated.

1/28/09: neatly dressed, depressed, overwhelmed, anhedonic, alert, oriented, pleasant, affect restricted, reality intact, poor concentration, on Celexa 50 mg., Trazodone 50 mg., diag[nosis]: MDD [major depressive disorder] recurrent prognosis guarded.

Discussion: allegations do not meet or equal listings 12.04. 12.06. On MRFC [mental residual functional capacity] claimant capable of simple routine work.

That same day, Dr. Sen completed a Mental Residual Functional Capacity Assessment finding that plaintiff was not significantly limited in the following:

- The ability to remember locations and work-like procedures

- The ability to understand and remember very short and simple instructions

- The ability to understand and remember detailed instructions

- The ability to carry out very short and simple instructions

- The ability to carry out detailed instructions

- The ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances

- The ability to sustain an ordinary routine without special supervision

- The ability to work in coordination with or proximity to others without being distracted by them

- The ability to make simple work-related decisions

- The ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods

- The ability to interact appropriately with the general public

- The ability to ask simple questions or request assistance

- The ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes

- The ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness

- The ability to respond appropriately to changes in the work setting

- The ability to be aware of normal hazards and take appropriate precautions

- The ability to set realistic goals or make plans independently of others

Dr. Sen found that plaintiff was moderately limited in the following:

- The ability to maintain attention and concentration for extended periods

- The ability to accept instructions and respond appropriately to criticism from supervisors

- The ability to travel in unfamiliar places or use public transportation

On March 30, 2009, plaintiff saw Dr. Jaffri and reported that she stopped working as a CNA because it was too stressful (Tr. at 344). She further explained that she felt overwhelmed with her financial situation and wished she were "not here." Dr. Jaffri questioned her about this and she said that she did not want to kill herself but that she felt overwhelmed and stressed out (Tr. at 344). Dr. Jaffri observed that plaintiff was casually dressed and neatly groomed with a fair mood and a full affect. She smiled during the conversation and talked cheerfully about her daughter no longer living with her. Dr. Jaffri noted that plaintiff had not pursued therapy. He assessed major depressive disorder, recurrent, moderate. He added Effexor to augment the Celexa and strongly encouraged plaintiff to seek

therapy (Tr. at 344).

Also on March 30, 2009, Dr. Jaffri completed a Medical Source Statement - Mental (Tr. at 334-335). Dr. Jaffri found that plaintiff is moderately limited in the following:

- The ability to remember locations and work-like procedures

- The ability to understand and remember very short and simple instructions

- The ability to carry out very short and simple instructions

- The ability to maintain attention and concentration for extended periods

- The ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances

- The ability to sustain an ordinary routine without special supervision

- The ability to work in coordination with or proximity to others without being distracted by them

- The ability to ask simple questions or request assistance

- The ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness

- The ability to be aware of normal hazards and take appropriate precautions

- The ability to travel in unfamiliar places or use public transportation

He found that plaintiff was markedly limited in the following:

- The ability to understand and remember detailed instructions

- The ability to carry out detailed instructions

- The ability to make simple work-related decisions

32

- The ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods

- The ability to interact appropriately with the general public

- The ability to accept instructions and respond appropriately to criticism from supervisors

- The ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes

- The ability to respond appropriately to changes in the work setting

- The ability to set realistic goals or make plans independently of others

(Tr. at 334-335).

From April 3, 2009, to April 6, 2009, plaintiff was a patient at Heartland Regional Medical Center after having suicidal thoughts for the past month (Tr. at 358-370). She said she was stressed due to losing her job, financial issues, and moving (Tr. at 362).

> The patient identifies 3 stressors prior to admission including approximately 3 weeks ago, her 17-year-old daughter and 3-month-old grandchild moving out of her apartment. Patient comments that she could do nothing to stop this. She also states she lost her job as a CNA and they had to move. She indicates ongoing financial problems. She comments that her husband is also on disability. . . . She states that she will rarely go to the gambling boat and may spend 20 dollars. . . . That patient indicates that she dislikes being around a lot of people. . . . The patient states that she applied for disability approximately 3 years ago and is still waiting for this to "come through." . . . The patient comments that the day of admission was a "terrible day." The patient states that she loves her grandbaby very much and was disappointed that she could not

persuade her daughter to remain in the home. . . . The patient states that she was diagnosed with bipolar disorder approximately 1 year ago. She states that she has stopped doing all of her usually enjoyed activities, such as walking, going outside, or camping. The patient comments that she has an appointment set up with Dr. Cathcart regarding food stamps and Medicaid.

Plaintiff's husband was on disability due to depression and she indicated they had been living off that since plaintiff quit her job as a CNA (Tr. at 368). Plaintiff denied recent headache, chest pain, shortness of breath, musculoskeletal disorder, and any other health problem besides chronic back pain. Plaintiff's physical exam was normal. Her affect was depressed and flat, her judgment was within normal limits, her insight was within normal limits, her thought content was within normal limits, and her eye contact was appropriate. Plaintiff's weight was 253 pounds. Plaintiff was superficially cooperative and pleasant, her affect was quiet and somewhat withdrawn, speech was clear, thought process was goal-directed. "The patient states at times she will gamble".

The doctor's initial impression was major depressive disorder, recurrent, severe, without psychotic features; rule out bipolar disorder type 2; anxiety disorder not otherwise specified; financial, housing, and relationship stress; and a GAF of 20.[11]

_____

[11]A global assessment of functioning of 11 to 20 means some danger of hurting self or others (e.g., suicide attempts without

Plaintiff's Celexa was reduced and her Effexor XR was increased. She reported "very positive days" with a significant improvement in mood, much better sleep, better appetite, no further thoughts of suicide, feeling more positive about the future, feeling much more interested in getting out and getting on with her life. She had no side effects or problems with her medication. On discharge, her concentration was intact, her energy level was improved, her moods were much improved, her affect was bright, her anxiety levels were not problematic. Her discharge diagnoses were major depressive disorder, recurrent, severe, without psychotic features, treated, improving; chronic back pain; financial stressors; and a GAF of 60.[12] She was given prescriptions for Ambien (for sleep), Celexa (for depression), and Venlafaxine XR (for anxiety and depression).

On April 8, 2009, plaintiff was seen by David Cathcart, D.O., for a Medicaid evaluation (Tr. at 379-381).

CHIEF COMPLAINT: Bipolar disorder, back and leg pain.

---

clear expectation of death; frequently violent; manic excitement) OR occasionally fails to maintain minimal personal hygiene (e.g., smears feces) OR gross impairment in communication (e.g., largely incoherent or mute).

[12]A global assessment of functioning of 51 to 60 means moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).

HISTORY OF PRESENT ILLNESS:  The patient is a 45-year-old white female who last worked in March this year as a certified nursing assistant.  She said that she is not able to continue working because of her back and also because of troubles with her bipolar disorder, having trouble staying focused and concentrating. . . .  She says, with respect to her back and legs, she cannot sit or stand for long periods of time, and she has an overwhelming lack of energy.

* * * * *

CURRENT MEDICATIONS:  Effexor [treats depression and anxiety] 150 mg daily, Celexa [treats depression] 20 mg daily, Ambien [treats insomnia] 10 mg daily, albuterol inhaler p.r.n. [as necessary for] shortness of breath.

* * * * *

SOCIAL HISTORY:  The examinee smokes about three quarters of a pack of cigarettes daily. . . .

REVIEW OF SYSTEMS:  Positive for some chest pain or lightness on exertion,. . . .  [S]ome dyspnea [shortness of breath] on exertion. . . .  She does have occasionally some pain radiating down her left leg and some numbness and tingling into the toes of her left foot.

PHYSICAL EXAMINATION:  Height 66 inches, weight 220. . . Pain level 8 of 10. . . .  She is alert, oriented and cooperative.  Her hygiene is good,.  I would estimate her level of intelligence to be average. She uses no assistive devices for ambulation and none are medically indicated. . . .  Her affect is markedly flattened. . . .

Musculoskeletal exam reveals a normal fluid gait.  Tandem walking was intact.  The patient was able to walk on toes and heels without difficulty.  The patient was able to squat fully and arise from a squat.  There was no difficulty getting on or off the exam table.  Exam of the cervical and dorsolumbar spine reveal range of motion to be full and unguarded.  There is no evidence of paraspinal muscle spasm. Range of motion of the shoulders, elbows, wrists, hips, knees and ankles are full and bilaterally symmetrical and unguarded. . . .  Range of motion of all joints of the hands and fingers are normal.  There are no significant degenerative findings evident. . . .  [Strength was normal

in all muscle groups.] Grip [is normal] bilaterally. . . . There is no atrophy or asymmetry noted. The patient is able to make a fist with both hands. Manual dexterity is normal. . . .

IMPRESSIONS
1.    History of bipolar disorder.
2.    Chronic back pain - I suspect degenerative disk disease.

PHYSICAL RESIDUAL FUNCTIONAL CAPACITY ASSESSMENT:  The following recommendations are based on my clinical judgement and reflect the claimant's ability to perform work related functions within a regular work setting on a day to day basis.  She can sit six hours in an eight-hour day, and can stand and walk six hours in an eight hour day.  I would estimate she can lift 30 to 40 pounds occasionally and 15 to 20 pounds frequently.  Pushing and pulling would be unrestricted other than that as indicated for lifting and carrying.  She should be restricted from climbing ladders and balancing at unprotected heights.  She should be restricted from more than occasional bending, stooping, kneeling, crouching and crawling.  There are no manipulative limitations involving her hands.  There are no environmental limitations such as exposure to extreme heat, cold, wetness, humidity, noise, vibrations, fumes, odors, dust, gases, poor ventilation or machinery hazards.

EXPLANATION:  This examinee's primary barrier to return to the competitive labor market, in my opinion, is her bipolar disorder.  If she is to be considered for Medicaid benefits, I would recommend that she be evaluated by a psychiatrist. In my opinion, she does not have a medical problem that rises to the level that prevents her from working a job within her degree of competence. . . .  She is not incapacitated or unemployable so she does not meet the criteria for general relief.

(Tr. at 379-381).

Plaintiff saw Dr. Jaffri on April 18, 2009, following her recent hospitalization for suicidal ideation (Tr. at 343).  Dr. Jaffri observed that plaintiff was casually dressed and that her

mood and affect were fair.  Plaintiff reported her depression was better but that she still experienced anxiety symptoms from time to time.  She reported her crying spells had decreased tremendously.  She had upcoming appointments with a caseworker and therapist (Tr. at 343).  She was diagnosed with major depressive disorder, recurrent, mild, and assessed a GAF of 60.[13]  She was instructed to take Restoril and to continue with Effexor and Ambien (Tr. at 343).  Dr. Jaffri encouraged a healthy lifestyle and noted that plaintiff had lost six pounds since her last visit.

Plaintiff was seen by Dr. Jaffri on May 2, 2009, for a follow up (Tr. at 342).  Plaintiff brought her grandchild with her to the appointment and said her grand baby was her "source of joy."  She report that the day before was "not good" because her husband and kids got on her nerves and almost brought her to tears.  She described today as "so far so good."  She was observed to be euthymic (normal, non-depressed mood) and had a bright affect.  Plaintiff indicated a poor sleep pattern and asked to try Trazodone.  Dr. Jaffri assessed major depressive

_____

[13]A global assessment of functioning of 51 to 60 means moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).

disorder, recurrent, mild and assigned a GAF of 65.[14]  He
encouraged a healthy life style.

On May 16, 2009, plaintiff did not show up for her
appointment with Dr. Jaffri (Tr. at 342).

On June 6, 2009, plaintiff saw Dr. Jaffri for a follow up
(Tr. at 340).  Plaintiff was casually dressed and had a
constricted affect.  Her sleep was better but she said, "I am not
quite there."  She reported "good news" - that she had a hearing
date for her disability case.  Plaintiff was told to continue
Trazodone and Vistaril, and her dose of Effexor was increased
(Tr. at 340).  Dr. Jaffri encouraged a healthy lifestyle.

**C.    _SUMMARY OF TESTIMONY_**

During the August 25, 2009, hearing, plaintiff testified;
and Lesa Keen, a vocational expert, testified at the request of
the ALJ.

**1.    Plaintiff's testimony.**

Plaintiff was 45 years of age at the time of the hearing and
is now 47 (Tr. at 21).  Plaintiff lived in a four-plex with her
ex-husband and their eight-month-old grandchild (Tr. at 21).  The

---

[14]A global assessment of functioning of 61 to 70 means some
mild symptoms (e.g., depressed mood and mild insomnia) or some
difficulty in social, occupational, or school functioning (e.g.,
occasional truancy, or theft within the household), but generally
functioning pretty well, has some meaningful interpersonal
relationships.

grandchild's mother was 17 and was trying to get on her feet;
plaintiff was hoping that the grandchild would be living with her
"for a while" (Tr. at 37).  There are 12 to 13 stairs leading up
to plaintiff's home (Tr. at 21).  Plaintiff was 5'5" tall and
weighed 220 pounds (Tr. at 21).

Plaintiff has a high school education (Tr. at 22).  She has
never had a driver's license because driving around other cars
makes her nervous (Tr. at 22).  When asked how she gets around,
plaintiff said, "I either walk or take public transportation."
(Tr. at 22).  Plaintiff can walk a couple of blocks before
becoming out of breath (Tr. at 22-23).  Plaintiff uses an inhaler
for chronic obstructive pulmonary disease; however, she was
unable to remember the last time she needed to use it (Tr. at
23).  She gets short of breath when she uses stairs or bends over
(Tr. at 23).

Plaintiff has back pain which is exacerbated by sitting and
bending over (Tr. at 38).  Plaintiff can sit for 15 to 20 minutes
before needing to stand up (Tr. at 38).  She can stand for about
a half hour before needing to sit down (Tr. at 38).  Plaintiff
lies down for a couple hours three to four times a day to relieve
her back pain and because of depression (Tr. at 38).  No doctor
has ever recommended an exercise or weight loss program; no
doctor has ever recommended back surgery (Tr. at 23).  Plaintiff

takes Ultracet and Flexeril for her back (Tr. at 23).  Plaintiff
had last taken the Ultracet "a couple of days ago" and had not
taken Flexeril "for a while" because of drowsiness (Tr. at 24).
Plaintiff takes Trazodone to help her sleep, but she testified it
does not help her much because she wants to sleep during the day
and has no energy (Tr. at 24).

Plaintiff suffers from headaches two or three times a week
(Tr. at 24).  Plaintiff testified that she cannot take Tylenol
because it interacts with her medications; however, the ALJ
pointed out that plaintiff's medication form lists Tylenol for
pain and she said, "I do take Tylenol" (Tr. at 25).

Plaintiff takes Vistaril for anxiety and it helps (Tr. at
25).  She was hospitalized in April 2009 for three or four days
for suicidal ideation (Tr. at 26).  She has had some suicidal
ideation since her hospitalization (Tr. at 27).  It was about
that time that she was prescribed Effexor and Vistaril (Tr. at
27).

Plaintiff has acid reflux disease for which she takes
medication when she can afford to get it (Tr. at 28-29).  She
takes over-the-counter Zantac (Tr. at 29).

Plaintiff was working as a certified nurse's assistant until
February 16, 2009, but she got fired because she "had a lot of
call-ins" due to anxiety (Tr. at 27-28).  She later said that her

call-ins were because of "back pain, medication I was taking, the depression, reoccurring problems at home, problems at work." (Tr. at 40). She missed four to five days of work per month (Tr. at 40).

During the hearing plaintiff experienced lower back pain (Tr. at 29). She described her back pain as a seven out of ten despite having taken some pain medication that she could not remember (Tr. at 29-30). When asked further, she testified that she had not taken over-the-counter medication and she used her last Ultracet several days ago (Tr. at 30). She ultimately admitted that she had not taken any pain medication that day (Tr. at 30).

Plaintiff fell down the stairs at her home in July 2008 and broke her tail bone (Tr. at 31). She testified that she has pain sometimes but was not having any pain "now, at this point" (Tr. at 31). Plaintiff gets bronchitis every September or October, and it lasts for three or four months (Tr. at 32). Plaintiff smokes about a pack of cigarettes per day (Tr. at 35).

Plaintiff uses a computer at the library to play games and for e-mailing (Tr. at 32). Plaintiff does her own housework sometimes (Tr. at 32). She is able to cook and do dishes, but because of her back she has to "switch back and forth from leg to leg" (Tr. at 33).

When asked whether she was able to climb the stairs in her home, plaintiff said, "No" (Tr. at 33). The ALJ asked, "You, you don't ever climb the stairs?" Plaintiff said, "Yeah, I do, but I have problems." The ALJ said, "Okay. But you can do that?" to which plaintiff replied, "I can, yes." (Tr. at 33).

Plaintiff testified that she can be walking and she will "just trip." (Tr. at 33). She said she could pick up a 12-pack of soda from the table and put it on the floor, but she would have problems bending over (Tr. at 33-34). If she dropped her keys on the floor, she would "try to bend over and pick them up." She could not get down on the floor to look for them because her legs and back would bother her and she would get short of breath (Tr. at 34).

Plaintiff is bothered by heat because when she goes outside she sweats profusely (Tr. at 35). Plaintiff has problems concentrating (Tr. at 35). When asked if she knows why she has problems with concentration, plaintiff said, "Yeah, because I'm wacko, I don't know, I mean I don't, I, I, things are only, there's a lot I can comprehend, but there's also a lot I can't comprehend." (Tr. at 36).

Plaintiff's Vistaril, Effexor and Trazodone make her tired; she has no desire to do anything, she has no energy, and she has no self-esteem. She believes this is because of her medication

(Tr. at 36).  Plaintiff has problems being around a lot of people
(Tr. at 36).  Going into a Wal-Mart makes her anxious; small
stores do not bother her (Tr. at 36).  Plaintiff has panic
attacks (with her last one being a couple weeks before the
hearing) and she has crying spells "quite frequently" -- once or
twice a day (Tr. at 37, 39).  Because of depression, plaintiff
does not shower as often as she should, she does not change her
clothes (Tr. at 39).  She has been seeing Dr. Jaffri for two to
three years, and she sees Dr. Jaffri once a month (Tr. at 39-40).

**2.  Vocational expert testimony.**

Vocational expert Lesa Keen testified at the request of the
Administrative Law Judge.  The first hypothetical involved a
person who could lift and carry 20 pounds occasionally and ten
pounds frequently; stand and walk for four hours per day; sit for
four hours per day; must have a sit/stand option "at will, but
would not otherwise adversely affect their ability to do the
work"; an unlimited ability to push and pull; could never crawl;
could occasionally climb, balance, stoop, kneel or crouch; should
avoid concentrated exposure to heat; should be limited to simple,
unskilled work with and SVP[15] of 2 or less (Tr. at 42-43).  The

---

[15]Specific Vocational Preparation is defined as the amount
of lapsed time required by a typical worker to learn the
techniques, acquire the information, and develop the facility
needed for average performance in a specific job-worker
situation.  This training may be acquired in a school, work,
military, institutional, or vocational environment.  It does not

vocational expert testified that such a person could not do any of plaintiff's past relevant work (Tr. at 43). Such a person could, however, work as a photocopy machine operator, D.O.T. 207.685-014 with 360 in Missouri that have the sit/stand option and 18,000 in the country (Tr. at 43). The person could also be a microfilm processor, D.O.T. 208.685-022 with 270 in Missouri with the sit/stand option and 12,000 in the country (Tr. at 43). The person could also be a small parts assembler, D.O.T. 207.684-022 with 1,300 in Missouri with the sit/stand option and 62,000 in the country (Tr. at 43).

The second hypothetical involved a person with all the limitations of the first hypothetical but who would need to have limited contact with the general public (Tr. at 44). The vocational expert testified that the person could still do those three jobs and the numbers would remain the same (Tr. at 44).

The vocational expert testified that a person with the limitations as found by Dr. Jaffri in the medical source statement would not be able to work due to the number of areas that are markedly restricted (Tr. at 45).

---

include the orientation time required of a fully qualified worker to become accustomed to the special conditions of any new job. Specific vocational training includes: vocational education, apprenticeship training, in-plant training, on-the-job training, and essential experience in other jobs. An SVP of 2 means anything beyond short demonstration up to and including 1 month.

The vocational expert testified that her testimony was consistent with the Dictionary of Occupational Titles and the Selected Characteristics of Occupations (Tr. at 44). The sit/stand option and the frequency of contact with the public is based on her experience working in the field subsequent to the last revisions of those two publications (Tr. at 44).

## V.   *FINDINGS OF THE ALJ*

Administrative Law Judge Guy Taylor entered his opinion on October 2, 2009 (Tr. at 9-16).

Step one.  Plaintiff has not engaged in substantial gainful activity since her alleged onset date (Tr. at 11).  Although plaintiff worked after her alleged onset date, it did not rise to the level of substantial gainful activity (Tr. at 11).

Step two.  Plaintiff suffers from major depressive disorder, generalized anxiety disorder, degenerative disc disease of the lumbar spine, and obesity, all severe impairments (Tr. at 11). Her breathing problems are not severe (Tr. at 11).

Step three.  Plaintiff's impairments do not meet or equal a listed impairment (Tr. at 13).

Step four.  Plaintiff retains the residual functional capacity to lift and carry 20 pounds occasionally and ten pounds frequently; stand or walk for four hours per day; sit for four hours per day; must have a sit-stand option; can push or pull

46

without limitation; can never crawl; can occasionally climb, balance, kneel, crouch and stoop; should avoid concentrated exposure to heat; requires only simple unskilled work at an SVP level of 2 or less; and should have limited contact with the public (Tr. at 14). With this residual functional capacity, plaintiff cannot return to her past relevant work (Tr. at 15).

Step five. Plaintiff can work as a photocopy machine operation (D.O.T. 207.685-014) with 250 jobs in Missouri and 18,000 in the country; a microfilm processor (D.O.T. 208.685-022), with 270 jobs in Missouri and 12,000 in the country; or a small parts assembler (D.O.T. 706.684-022) with 1,300 jobs in Missouri and 62,000 in the country (Tr. at 16).

## VI. CREDIBILITY OF PLAINTIFF

Plaintiff argues that the ALJ erred in finding that plaintiff's testimony was not credible.

## A. CONSIDERATION OF RELEVANT FACTORS

The credibility of a plaintiff's subjective testimony is primarily for the Commissioner to decide, not the courts. Rautio v. Bowen, 862 F.2d 176, 178 (8th Cir. 1988); Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987). If there are inconsistencies in the record as a whole, the ALJ may discount subjective complaints. Gray v. Apfel, 192 F.3d 799, 803 (8th Cir. 1999); McClees v. Shalala, 2 F.3d 301, 303 (8th Cir. 1993). The ALJ,

however, must make express credibility determinations and set forth the inconsistencies which led to his or her conclusions. Hall v. Chater, 62 F.3d 220, 223 (8th Cir. 1995); Robinson v. Sullivan, 956 F.2d 836, 839 (8th Cir. 1992). If an ALJ explicitly discredits testimony and gives legally sufficient reasons for doing so, the court will defer to the ALJ's judgment unless it is not supported by substantial evidence on the record as a whole. Robinson v. Sullivan, 956 F.2d at 841.

In this case, I find that the ALJ's decision to discredit plaintiff's subjective complaints is supported by substantial evidence. Subjective complaints may not be evaluated solely on the basis of objective medical evidence or personal observations by the ALJ. In determining credibility, consideration must be given to all relevant factors, including plaintiff's prior work record and observations by third parties and treating and examining physicians relating to such matters as plaintiff's daily activities; the duration, frequency, and intensity of the symptoms; precipitating and aggravating factors; dosage, effectiveness, and side effects of medication; and functional restrictions. Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). Social Security Ruling 96-7p encompasses the same factors as those enumerated in the Polaski opinion, and additionally states that the following factors should be considered:

Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; and any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board).

The specific reasons listed by the ALJ for discrediting plaintiff's subjective complaints of disability are as follows:

The claimant indicates she is overwhelmed by mental and physical problems, but this assertion is poorly supported by the objective medical record. As noted above, the claimant has been assessed with some significant medical conditions, including a back disorder and a depressive/anxiety disorder. The actual impact of these conditions, however, has been relatively mild. The claimant's back condition has responded relatively well to conservative treatment and objective testing shows the claimant to have only mild to moderate degenerative disc disease in her lumbar spine. Although the evidence regarding the claimant's back condition is weak, the undersigned has given the claimant's subjective complaints of pain some weight and has concluded the claimant needs a stand/sit option.

The claimant also has complained of depression as well as breathing problems related to bronchitis and chronic obstructive pulmonary disease. As noted above, however, the claimant's breathing deficits have responded well to treatment (inhaler) and the claimant conceded during the hearing that she could not remember the last time she even needed to use her inhaler. With regard to her mental condition, the undersigned has given the claimant some limitations related to her depressive/anxiety disorder. The marked limitations opined by Dr. Jaffri, however, are given little weight in this case and are undermined by the objective medical record as well as by Dr. Jaffri's own progress notes. It is also important to note that no doctor of record, including Dr. Jaffri, has indicated the claimant's mental or physical problems would be completely

debilitating or would precluded all work.  Instead, it has only been indicated the claimant would be limited in the type of work she could perform.

The claimant indicates she does little during a typical day and has trouble with household chores and activities of daily living.  The claimant's husband in his Function Report (Third Party) buttressed these assertions and indicated the claimant was extremely limited in her daily activities. Such limitations, however, are not supported by the objective medical record.  Moreover, the objectivity of the claimant's husband is questionable in this case considering his relationship to the claimant and his pecuniary interest in the outcome.  It is also important to note the claimant has a sporadic work history with low earnings, which is not reflective of an individual with strong motivation to work. The claimant also has not been completely forthright about her work history.  As noted above, it appears the claimant worked for a period in 2008, after her alleged onset date of disability.  Although this work is not found to be "substantial gainful activity," it shows mental and physical abilities greater than alleged and undercuts the claimant's credibility.  Overall, the undersigned concludes the claimant is not fully credible in this case.  The claimant has some limitations, but these limitations are less severe than alleged and the claimant is able to perform work at the above residual functional capacity.

(Tr. at 14-15).

## 1.    PRIOR WORK RECORD

The ALJ properly noted that plaintiff's work history shows sporadic earnings.  For ten years, plaintiff had no earnings whatsoever.  In 1983 her annual earnings totaled $43.68, and in 1982 her annual earnings totaled $149.46.  For seven years, she earned less than $5,000.00; she has earned more than $8,000.00 during only three years in her entire life with her highest annual earnings being $14,154.38.

## 2. DAILY ACTIVITIES

In her administrative paperwork, plaintiff indicated that she does laundry by hand which takes a couple of hours, she puts dishes away, dusts, vacuums, takes care of her daughter and granddaughter, fixes meals, cleans, mops, sweeps, shops "all day," plays on the computer and plays board games.  In February 2008 medical records, it is reflected that plaintiff was "walking everywhere."  In the second half of 2008 and beginning of 2009 she was working as a certified nurse's assistant.  These daily activities are inconsistent with the total disability as alleged by plaintiff.

## 3. DURATION, FREQUENCY, AND INTENSITY OF SYMPTOMS

Plaintiff rarely saw doctors for her back pain, and her treatment by Dr. Jaffri for her mental impairment was sometimes sporadic and consisted mainly of follow ups and refills on the same doses of the same medications, indicating that plaintiff's symptoms were either not very severe or were adequately controlled by medication when she took it.

Plaintiff's alleged onset date is May 3, 2007; however, she did not seek any medical treatment until September 10, 2007 -- more than four months after her alleged onset date.  On that visit she indicated she had not taken any medications "for a long time."  Plaintiff saw treating sources for back pain very rarely,

and the records indicate she rarely took medication for pain.

On May 23, 2007, plaintiff sat with an interviewer from SSA for more than 1 1/2 hours without showing any signs of pain. On May 30, 2007, she was taking no regular medications for any of her impairments. Despite taking no medication for her mental impairment, plaintiff was assessed with only moderate symptoms, such as having few friends or conflicts with peers or coworkers.

While plaintiff was a patient at Heartland Regional Medical Center (for suicidal thoughts), she denied any physical problems other than chronic back pain. Just a couple days later when she saw Dr. Cathcart, plaintiff's reported medications did not include any medication for back pain. (On admission to Heartland, plaintiff commented that she had an appointment scheduled for April 8 with Dr. Cathcart for a Medicaid evaluation and for food stamps.)

On September 23, 2008, plaintiff saw Dr. Jaffri after four months and two missed appointments. At that time, she reported no crying spells and being able to cope with periods of low moods. Plaintiff waited another three months before seeing Dr. Jaffri again. At that visit, she reported being worried about her daughter, but plaintiff continued to work as a CNA and Dr. Jaffri continued her on her same medications. By March of 2009, plaintiff still had not begun therapy as had been suggested by

Dr. Jaffri.

Plaintiff saw the doctor in January 2009 for bronchitis and reported "no other significant complaints." Plaintiff's physical exam (with the exception of her lungs) was normal.

## 4.   *PRECIPITATING AND AGGRAVATING FACTORS*

Plaintiff's mental impairment seems to be situational and focused on her daughter's problems and plaintiff's lack of money -- she indicated that her symptoms began when her daughter started hanging out with the wrong crowd; in May 2008 she was stressed out because of her daughter and her boy friend's illness; in February 2009 she reported stress from having had an altercation with her daughter's boy friend; in March 2009 she was overwhelmed with her financial situation; in April 2009 she was hospitalized for suicidal thoughts brought on by financial issues, the loss of her job, moving, and her granddaughter (whom she indicated she loved very much) moving out of the home.

Plaintiff indicated to Dr. Miller, in connection with her application for Medicaid, that her back pain is worse with activity. In July 2008 after she fell down the stairs, plaintiff indicated that she had increased pain with sitting. She was told to sit on a pillow while at work.

There are no other references to precipitating or aggravating factors.

5.   *DOSAGE, EFFECTIVENESS, AND SIDE EFFECTS OF MEDICATION*

The record reflects that plaintiff's symptoms are controlled with medication.

In a Pain Questionnaire, plaintiff indicated that her medication helped to relieve her pain (Tr. at 226).

In January 2008 Celexa was working well for plaintiff. In February 2008 during a psychological evaluation, she indicated that her medications help with her mental symptoms. In July 2008 she reported that Tylenol improved her pain after she fell down the stairs. All during 2008, Dr. Jaffri continued plaintiff on her same medications.

During a three-day hospitalization in April 2009, plaintiff's increase in Effexor and decrease in Celexa resulted in "very positive days" with a significant improvement in mood, much better sleep, better appetite, no further thoughts of suicide, feeling more positive about the future, feeling much more interested in getting out and getting on with her life, and caused no side effects. She went from a GAF of 20 (when she reportedly had a very bad day due to her daughter and granddaughter moving out) to a GAF of 60 three days later.

Plaintiff reported no significant medication side effects to her treating physicians.

## 6.   FUNCTIONAL RESTRICTIONS

In June 2007, Dr. Miller suggested an exercise program, weight loss, and smoking cessation.  He did not indicate that plaintiff had any functional restrictions.  When plaintiff fell down the stairs, she was told to sit on a pillow at work, indicating that even with her fall plaintiff was still able to work.  In February 2009 plaintiff was told to engage in regular exercise.

In June 2007, Dr. Cathcart indicated that plaintiff had no physical problems which would prevent her from working.  Two years later, in April 2009, Dr. Cathcart found that plaintiff had normal and unguarded range of motion, no significant degenerative findings, normal strength, normal grip, no atrophy, and normal manual dexterity.  He found that plaintiff could sit for six hours; stand and walk for six hours; lift 30 to 40 pounds occasionally and 15 to 20 pounds frequently; push and pull without limitation; should be restricted from climbing ladders and balancing at unprotected heights; should be restricted from more than occasional bending, stooping, kneeling, crouching and crawling; had no manipulative limitations involving her hands; had no environmental limitations such as exposure to extreme heat, cold, wetness, humidity, noise, vibrations, fumes, odors, dust, gases, poor ventilation or machinery hazards.  He wrote,

"She does not have a medical problem that rises to the level that prevents her from working a job within her degree of competence."

**B.      *CREDIBILITY CONCLUSION***

In addition to the above factors, I note the following with respect to plaintiff's credibility. Although plaintiff testified that she lies down for a couple of hours three to four times a day (which apparently totals six to eight hours), in her administrative paperwork, she stated that she might take "a nap" in the afternoon.

In her Function Report dated June 10, 2007, plaintiff's responses with regard to her limitations differed from her responses in the December 19, 2008, Function Report. In the earlier report, she circled just about everything, except standing was not a problem. In the latter report, she circled standing as having been affected by her conditions, but she indicated that she did not have a problem with reaching, walking, sitting, or concentrating -- all of which were circled in the report a year earlier.

Although plaintiff indicated in a Pain Questionnaire that she could only sit for 15 to 20 minutes at a time, she was able to sit without any discomfort for more than an hour and a half when meeting with someone about her disability application.

Plaintiff testified that she has problems with memory; however, during a psychological evaluation on May 30, 2007, there was no evidence of long or short term memory loss. In addition, every time she saw Dr. Jaffri, he noted that her memory was not impaired.

Plaintiff testified that she is uncomfortable being around people; however, she told her treating doctor that she goes to the gambling boats, and she indicated in her administrative paperwork that she goes to the library to play games on the computers and that when she shops she does it "all day."

Plaintiff told the doctors at Heartland that she and her family had been living off her husband's disability checks due to a mental disability since she quit her job and that she was stressed due to financial issues. This suggests a motivation for attempting to get disability benefits other than because of true disability.

While a patient at Heartland, plaintiff's physical exam was normal. Although she denied chest pain and shortness of breath while at the hospital April 3 through 6, 2009, she saw Dr. Cathcart just two days later in connection with her application for Medicaid and food stamps and reported chest pain on exertion and shortness of breath on exertion. She told Dr. Cathcart that her pain was an "8 out of 10" but she was on no medication for

pain and had not seen a treating doctor for pain since her July 2008 fall down the stairs -- about nine months earlier.

During the hearing, plaintiff testified that no doctor has ever recommended an exercise or weight loss program, which is clearly not true. Dr. Miller recommended she lose weight and exercise, and Dr. Jaffri continually recommended a "healthy lifestyle." Nurse Practitioner Peggi Riche noted that plaintiff's "goal is to maintain regular exercise."

At the hearing on August 25, 2009, plaintiff testified that she "takes Ultracet and Flexeril" for her back. However, plaintiff was prescribed Tramadol (the same as Ultracet) on July 27, 2008, with "no refills." No other doctor ever prescribed that medication according to the records. Plaintiff was prescribed Flexeril on September 10, 2007 -- about two years before her hearing -- and the records do not indicate that plaintiff ever got a subsequent prescription for that muscle relaxer. Further, on April 8, 2009 -- about four and a half months before her testimony -- plaintiff did not list either of these medications when she saw Dr. Cathcart.

Plaintiff testified that she suffers from headaches two or three times a week; however, a few months before the hearing she denied having headaches, and she never reported headaches to any of her treating doctors.

Plaintiff testified that she could not take Tylenol because it interacted with her medications; but when the ALJ pointed out that she listed Tylenol on her medication form, she admitted that she does take Tylenol.

During the hearing plaintiff claimed to experience lower back pain which she rated a seven out of ten despite having taken some pain medication that she could not remember. When asked further, she testified that she had not taken over-the-counter medication and she used her last Ultracet several days ago. She ultimately admitted that she had not taken any pain medication that day and, as mentioned above, plaintiff had not had a prescription for Ultracet for almost a year and even then the prescription had no refills.

Plaintiff testified that she broke her tail bone when she fell down the stairs, but the medical records list it only as a bruise. Plaintiff had normal range of motion and no tenderness. She was given a prescription for a muscle relaxer with no refills and a pain reliever with no refills and was told to sit on a pillow while at work -- hardly indicative of a broken tail bone.

Plaintiff testified that she gets bronchitis every September or October and said it lasts for three or four months. Plaintiff was diagnosed with bronchitis on only one occasion and continued smoking despite that diagnosis.

Plaintiff testified that she was fired from her job as a CNA in February 2009 because of all her absences due to anxiety. She later said her absences were due to back pain, her medication, depression, and problems at home and work. However, she told her doctor that she quit her job, not that she was fired.

When asked whether she was able to climb the stairs in her home, plaintiff said, "No." The ALJ asked, "You, you don't ever climb the stairs?" Plaintiff said, "Yeah, I do, but I have problems." The ALJ said, "Okay. But you can do that?" to which plaintiff replied, "I can, yes."

Plaintiff testified that she can be walking and will "just trip;" however, she never reported tripping to any treating or consultative doctor.

Plaintiff testified that if she dropped something she could not get on the floor to get it because her legs and back would bother her and she would become short of breath. However during exams, plaintiff had no difficulty squatting fully and arising from a squatting position.

When asked if she knows why she has problems with concentration, plaintiff said, "Yeah, because I'm wacko, I don't know, I mean I don't, I, I, things are only, there's a lot I can comprehend, but there's also a lot I can't comprehend." Yet plaintiff's mental health records show that she had no difficulty

with concentration -- the only records which indicate problems concentrating are the ones that merely make assessments based on plaintiff's subjective complaints. All of Dr. Jaffri's records indicated that plaintiff's concentration was fair: November 12, 2007; December 3, 2007; January 3, 2008; February 25, 2008; April 9, 2008; May 20, 2008; July 1, 2008; September 23, 2008; and December 30, 2008. Further, in a December 19, 2008, Function Report, plaintiff indicated no difficulty with concentration.

Plaintiff testified that she has crying spells "quite frequently" such as "once or twice a day." However, on April 9, 2008, she told Dr. Jaffri she had experienced no crying; on May 20, 2008, she told Dr. Jaffri she had experienced no crying; on July 1, 2008, she told Dr. Jaffri she had experienced no crying; on September 23, 2008, she told Dr. Jaffri she had experienced no crying; and on the last medical visit during which crying was mentioned (on April 18, 2009), plaintiff indicated that her crying spells had "decreased drastically." This was just two weeks after her hospitalization for suicidal thoughts.

Plaintiff testified that she does not shower as often as she should and does not change her clothes. Yet almost every medical record indicates that plaintiff's dress and hygiene were adequate. She was described as "unkempt" on two occasions, but she was never observed as having inadequate hygiene.

Based on all of the above, I find that the ALJ's decision to discredit plaintiff's subjective complaints of disabling symptoms is supported by the record.

## VII. MENTAL IMPAIRMENT

Plaintiff argues that the ALJ failed to base the RFC on substantial evidence of record and to provide sufficient mental limitations.  Specifically plaintiff argues that the ALJ erred in basing the RFC on a consultative exam from 2007 and the opinions of the state agency medical consultants in 2009 instead of relying on plaintiff's treating physician, Dr. Jaffri.

The ALJ had the following to say about plaintiff's mental impairment:

> The claimant also indicates she is depressed and anxious. She, however, has conceded many of her emotional problems are related to her daughter, who she feels has become involved with a bad crowd. . . .
>
> . . .  [E]valuations have continued to indicate the claimant is relatively capable both mentally and physically.  In August 2006, State agency medical consultants opined the claimant's mental limitations were so mild the claimant should not even be assessed with a "severe" mental impairment as defined under the Regulations.  Throughout 2007 and 2008, the record reflects the claimant continued to receive follow-up care for her mental condition.  As part of her treatment, the claimant was prescribed various medication regimens and progress notes reflect the claimant, although having some ups and downs, did relatively well when following prescribed treatment.  In particular, the claimant's mental condition was described as stable and she was described as "doing fairly well."  At most, it was indicated the claimant should be limited to simple repetitive work.  Furthermore, State agency medical consultants opined in 2009 that the claimant only had some

moderate limitations in her ability to maintain
concentration, persistence, and pace, and the claimant was
assessed with no marked or extreme limitations. Similarly,
State agency medical consultants have indicated that the
claimant's physical condition has remained relatively stable
in recent years and has imposed few, if any, limitations on
the claimant's functioning. In March 2009, it was
specifically opined that the claimant's back condition was
not a severe impairment since there was no reported
functional limitations. . . .

Although the claimant's mental condition has been found to
be much more stable than found by Dr. Jaffri, the claimant
did have a setback in April 2009. At that time, the
claimant had to be treated at the Emergency Room of
Heartland Regional Medical Center secondary to complaints of
depression and suicidal ideation. Upon examination, the
claimant was assessed with a major depressive disorder and
anxiety disorder. Progress notes reflect, however, that the
claimant responded well to treatment as well as to a change
in her medication regimen. The claimant only remained at
the medical center for a few hours and she testified (during
the hearing) that her new medication regimen has worked well
in preventing the reoccurrence of such an event.
Considering these circumstances, the undersigned does not
find this event to be particularly significant or reflective
of the claimant's mental functioning. Instead, this event
appears to be an aberration, which had only a short-term
impact on the claimant's functioning.

(Tr. at 11-13).

The evidence in the record supports the ALJ's finding that

plaintiff is limited by no more than the need for simple

unskilled work at an SVP level of 2 or less and the need to have

limited contact with the public. In fact, the record barely

supports even those limitations.

On May 30, 2007, plaintiff underwent a psychological

evaluation and showed no evidence of long or short term memory

loss. Her attention span was within normal limits. On June 7, 2007, plaintiff was examined by Dr. Miller who observed normal mood and affect.

In June 2007 plaintiff was on no medication for a mental impairment. Despite that she was pleasant, alert, oriented, cooperative, and had good hygiene. Dr. Cathcart stated that plaintiff's mental impairment could be accommodated in the competitive labor market. In August 2007, Dr. Spence, a psychologist, found that plaintiff's mental impairment was not severe. He found that she had only mild restriction of activities of daily living; mild difficulties in maintaining social functioning; and no difficulties in maintaining concentration, persistence or pace. Plaintiff told Dr. Jaffri on her initial visit that she experienced recurrent episodes of depression "which were not strong." In February 2008 plaintiff underwent a psychological evaluation and was observed to have average comprehension, no evidence of short or long term memory loss, and a normal attention span. In February 2008 plaintiff was reported as doing fairly well. In July 2008 she was seen at Heartland Regional Medical Center and her psychiatric exam was "appropriate." In February 2009 plaintiff was pleasant and euthymic. Later that month Dr. Sen found that plaintiff had only mild restriction in activities of daily living; mild difficulties

in maintaining social functioning; and moderate difficulties in maintaining concentration, persistence and pace. He found that plaintiff was not significantly limited in the ability to remember locations and work-like procedures, understand and remember instructions, carry out instructions, perform activities within a schedule, maintain regular attendance, be punctual, sustain an ordinary routine, work in coordination with or proximity to others, make simple work-related decisions, complete a normal workday and workweek, perform at a consistent pace without unusual rest periods, interact appropriately with the general public, ask simple questions or request assistance, get along with others, maintain socially appropriate behavior, respond appropriately to changes, be aware of hazards, set realistic goals or make plans. He found that plaintiff was only moderately limited in her ability to maintain attention and concentration for extended periods.

In April 2009 while at Heartland, plaintiff was observed to have normal judgment, normal insight, normal thought content, and normal eye contact. She was cooperative and pleasant, her speech was clear, and her thought process was goal-directed. Plaintiff was assessed with a GAF of 20 based on her report of symptoms -- but three days later she was assessed with a GAF of 60 and her symptoms had resolved. In May 2009 plaintiff had a normal, non-

depressed mood and had a bright affect, as reported by Dr. Jaffri.

Plaintiff claimed to suffer from bipolar disorder; however, she was only assessed with that condition on one occasion. On September 10, 2007, plaintiff was assessed with bipolar disorder based on the Zung Self-Rating Anxiety Scale which is a self-report assessment device. She was observed to be pleasant; her exam was normal. No testing was done in order to arrive at this assessment other than reviewing plaintiff's subjective complaints.

On May 23, 2007, an SSA examiner met with plaintiff for more than an hour an a half and observed that plaintiff had no difficulty with understanding, coherency, or concentrating. Plaintiff admitted that she plays computer games and board games which require some level of concentration. In addition she was able to work as a certified nurse's assistant during a significant portion of the time she alleges she was disabled.

Plaintiff's treating psychiatrist found that her memory and concentration were fair every time he saw her: November 12, 2007; December 3, 2007; January 3, 2008; February 25, 2008; April 9, 2008; May 20, 2008; July 1, 2008; September 23, 2008; and December 30, 2008.

The ALJ relied on the findings of all of the mental examiners, including Dr. Jaffri, in assessing plaintiff's mental residual functional capacity. After reviewing the evidence of record, as outlined above, I find that the evidence supports the ALJ's decision to limit plaintiff to no more than simple unskilled work at an SVP level of 2 or less and limited contact with the public. The evidence does not support any greater mental restriction.

## VIII. DR. JAFFRI

Plaintiff argues that the ALJ improperly discounted the opinion of Dr. Jaffri in his Medical Source Statement Mental dated March 30, 2009. The ALJ had this to say about Dr. Jaffri:

> In contrast to the above findings is the mental assessment completed by Dr. Jaffri in March 2009. Unlike other mental assessments, Dr. Jaffri assessed the claimant with marked limitation in the areas of understanding and memory; concentration and persistence; social interaction; and adaptation. As one of the claimant's treating physicians, the undersigned considered closely the findings of Dr. Jaffri. Dr. Jaffri however, provides no medical or clinical findings to support his conclusions. Moreover, progress notes provided by the doctor present a picture of the claimant much different than the one he presented in his March 2009 assessment. Dr. Jaffri's progress notes indicated the claimant was functioning relatively well with medication. Moreover, many of the claimant's difficulties with anxiety were related to anxiety she felt about her daughter's troubled life, not about anxiety in her own life. It is also important to note that the claimant revealed to Dr. Jaffri that she was working as a certified nursing assistant (CNA) for a period in 2008. Obviously, this ability to work undermines the doctor's findings that the claimant was suffering with "marked" mental limitations in the above-cited areas of mental functioning. Considering

these factors and the overall record, Dr. Jaffri's
assessment of March 2009 is given little weight and is not
found persuasive in this case.

(Tr. at 12-13).

A treating physician's opinion is granted controlling weight
when the opinion is not inconsistent with other substantial
evidence in the record and the opinion is well supported by
medically acceptable clinical and laboratory diagnostic
techniques.  Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005);
Ellis v. Barnhart, 392 F.3d 988, 998 (8th Cir. 2005).  If the ALJ
fails to give controlling weight to the opinion of the treating
physician, then the ALJ must consider several factors to
determine how much weight to give the opinion:  (1) the length of
the treatment relationship, (2) frequency of examinations (3)
nature and extent of the treatment relationship, (4)
supportability by medical signs and laboratory findings, (5)
consistency of the opinion with the record as a whole, and (6)
specialization of the doctor.  20 C.F.R. § 404.1527(d)(2) - (5).

In this case, the relevant factors are supportability by
medical signs and laboratory findings and consistency of the
opinion with the record as a whole.  I find that the ALJ's
discrediting the opinion of Dr. Jaffri in the March 30, 2009,
Medical Source Statement Mental is supported by the evidence.

❑    Dr. Jaffri found that plaintiff was moderately impaired in her ability to adhere to basic standards of neatness and cleanliness.  On November 12, 2007, and September 23, 2008, Dr. Jaffri described plaintiff as "unkempt."  However, on January 3, 2008, he noted that she was neatly dressed; on July 1, 2008, he noted that she was adequately groomed; on January 28, 2009, he described her as neatly dressed; on March 30, 2009, he described her as neatly groomed.  Glenn Schowengerdt, on May 30, 2007, observed that plaintiff's hygiene was adequate; on February 15, 2008, Mr. Schowengerdt observed that plaintiff's hygiene was adequate.

❑    Dr. Jaffri found that plaintiff was markedly limited in her ability to make simple work-related decisions.  However, on December 3, 2007, he noted that plaintiff's insight and judgment were fair; on September 23, 2008, he found that her insight and judgment were fair.  In April 2009 at Heartland Medical Center plaintiff's judgment was found to be within normal limits.  There is nothing in Dr. Jaffri's records (or any other records) indicating that plaintiff would be limited in her ability to make simple work-related decisions.

❑    Dr. Jaffri found that plaintiff was moderately limited in her ability to use public transportation.  However, the record

(including plaintiff's own testimony) establishes that she routinely used public transportation as she is not a driver.

❑    Dr. Jaffri found that plaintiff was moderately limited in her ability to remember locations and work-like procedures and very short and simple instructions and markedly limited in her ability to remember detailed instructions.  However, on March 30, 2007, there was no evidence in a psychological evaluation of any difficulty with long or short term memory; on February 15, 2008, there was no evidence of difficulty with long or short term memory.  Dr. Jaffri described plaintiff's memory as fair every time he saw her -- November 12, 2007; December 3, 2007; January 3, 2008; February 25, 2008; April 9, 2008; May 20, 2008; July 1, 2008; September 23, 2008; and December 30, 2008.  On January 28, 2009, when asked to describe plaintiff's memory, he wrote, "alert and oriented."  None of his records support any finding of memory difficulties.  No other medical records support Dr. Jaffri's findings of memory difficulties.

❑    Dr. Jaffri found that plaintiff was moderately limited in her ability to carry out very short and simple instructions and markedly limited in her ability to carry out detailed instructions.  He found that plaintiff was markedly limited in her ability to get along with coworkers or peers and to accept

70

instructions.  However, plaintiff had been working as a certified nurse's assistant during the six months preceding this opinion.

❑    Dr. Jaffri found that plaintiff was moderately limited in her ability to be aware of normal hazards and take appropriate precautions.  However, during almost the entire time plaintiff was his patient, she was taking care of her infant grandchild which clearly requires one to be aware of normal hazards.

❑    Dr. Jaffri found that plaintiff was markedly limited in her ability to interact appropriately with the general public. Yet plaintiff admitted that she occasionally went to the gambling boats, she shopped "all day," and she spent a significant amount of time at the library playing on the computers.  Clearly she is not markedly limited in her ability to interact appropriately with the general public.

In addition to the above, on January 3, 2008, Dr. Jaffri noted that the increase in Celexa was working well for plaintiff. He noted that she was pleasant and cooperative, her mood was fair, and her exam was essentially normal.  On February 25, 2008, Dr. Jaffri wrote, "She is doing fairly well."  Plaintiff was cooperative, her mood was fair, and her exam was essentially normal.  On April 9, 2008, Dr. Jaffri noted that plaintiff was pleasant and cooperative, her mood was fair, and her exam was essentially normal.  On May 20, 2008, Dr. Jaffri described

plaintiff as cooperative with a fair mood and a normal mental status exam.  On July 1, 2008, he noted that her exam was normal. On September 23, 2008, she was pleasant and cooperative.  On March 30, 2009, Dr. Jaffri noted plaintiff's fair mood and full affect, she smiled during the conversation and talked cheerfully. On May 2, 2009, plaintiff had a normal, non-depressed mood and a bright affect.  He described her major depressive disorder as "mild" and assessed a GAF of 65 which means only mild symptoms. Every time he saw plaintiff, her memory and concentration were fair.

At the time Dr. Jaffri completed the Medical Source Statement, he had seen plaintiff only four times in the past nine months.  He made no changes to her medications, he noted that she was working during most of that time, and her exams were essentially normal.  There simply is no support in his records, or in anyone else's records, for the restrictive findings in his Medical Source Statement - Mental.  The ALJ did not err in discounting this opinion.

## IX.  SIT-STAND OPTION

Plaintiff argues that the ALJ erred in failing to specify the frequency of the sit/stand option.  "SSR 96-7 specifically requires the sit/stand option to be specific as the frequency of the individual's need to alternate sitting and standing . . .

will erode the occupational base for a full range of unskilled light work." Plaintiff's argument is without merit. The ALJ phrased his question as follows, "at will, but would not otherwise adversely affect [her] ability to do the work." The vocational expert's testimony with regard to the sit/stand option came from her experience working in the field subsequent to the last revisions of the Dictionary of Occupational Titles and the Selected Characteristics of Occupations.

Vocational expert testimony providing occupations with an at-will sit/stand option renders harmless any technical error involving noncompliance with the sit/stand specificity requirement of Rule 96-9p. See Forte v. Barnhart, 377 F.3d 892, 896 (8th Cir. 2004); Davis v. Apfel, 239 F.3d 962, 966 (8th Cir. 2001); Fallon v. Soc. Sec. Admin., 2011 U.S. Dist. Lexis 4644, *7-8, 2011 WL 167039, *3 (D. Me. Jan. 14, 2011); Cutting v. Astrue, 2010 U.S. Dist. Lexis 71937, *8, 2010 WL 2595144, *3 (D. Me. June 23, 2010).

## VII. CONCLUSIONS

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled. Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied. It is further

ORDERED that the decision of the Commissioner is affirmed.


                            /s/ Robert E. Larsen
                            ROBERT E. LARSEN
                            United States Magistrate Judge

Kansas City, Missouri
May 13, 2011